Filed 8/11/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF SELMA,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>FRESNO COUNTY LOCAL AGENCY FORMATION COMMISSION,<br><br>    Defendant and Respondent;<br><br>CITY OF KINGSBURG,<br><br>    Real Party in Interest and Respondent. | F072147<br><br>(Super. Ct. No. 13CECG02651)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[No Change in Judgment]** |

**THE COURT:**

It is ordered that the opinion filed herein on July 14, 2016, and reported in the Official Reports (1 Cal.App.5th 573) be modified in the following particulars:

On page 6 of the slip opinion, the fifth full paragraph, beginning "By June 5, 2013," is deleted and the following paragraph is inserted in its place:

> An executive officer's report stated the April 10, 2013, hearing had been "continued to a date uncertain (with a target date of June 5, 2013) to allow time" for a transition agreement to be negotiated. However, as of June 5, 2013, the parties were still in negotiations on a transition agreement. According to the agenda for the June 5, 2013, LAFCo meeting, the commission was given an update concerning the Kingsburg annexation

matter.  The June 5, 2013, executive officer's report indicated LAFCo staff intended for the transition agreement issue, among others, to be "resolved in time for the August 7, 2013 hearing[.]"

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
                                         PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
DETJEN, J.

Filed 7/14/16 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF SELMA,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>FRESNO COUNTY LOCAL AGENCY<br>FORMATION COMMISSION,<br><br>    Defendant and Respondent;<br><br>CITY OF KINGSBURG,<br><br>    Real Party in Interest and Respondent. | F072147<br><br>(Super. Ct. No. 13CECG02651)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Costanzo & Associates and Neal E. Costanzo for Plaintiff and Appellant.

Baker, Manock & Jensen and Kenneth J. Price for Defendant and Respondent.

Kahn, Soares & Conway, Rissa A. Stuart and Michael J. Noland for Real Party in Interest and Respondent.

-ooOoo-

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.D through III of the DISCUSSION.

## INTRODUCTION

When a local agency formation commission sets a public hearing on a reorganization proposal and thereafter continues the hearing date beyond the 70-day limitation for continuances under Government Code section 56666, subdivision (a), is the approval of the reorganization proposal by the commission void because it violated a mandatory provision?  We conclude the 70-day limitation is a directory rather than a mandatory provision.  As a result, we hold the violation of the 70-day limitation in this case did not affect the validity of the commission's actions taken at the continued hearing.

## FACTS

### 1.    The Project

In 2012, the City of Kingsburg (Kingsburg) studied a proposal to annex approximately 430 acres of land in Fresno County (the Annexation Territory).  The Annexation Territory included 350 acres that had been developed with industrial/commercial uses, 52 undeveloped acres, and approximately 28 acres of street rights-of-way.  The Annexation Territory is home to at least three major facilities, including:  a glass manufacturing plant run by Guardian Industries Corp., a grape processing facility run by Vie-Del Company, and a raisin processing plant run by Sun-Maid Growers of California.

In addition to annexing the land into Kingsburg, the project also involved detaching portions of the Annexation Territory from the Fresno County Fire Protection District (FCFPD), the Consolidated Irrigation District, and the Kings River Conservation District.  The project also involved annexing portions of the Annexation Territory into the Selma-Kingsburg-Fowler County Sanitation District.  Finally, the project included prezoning approximately 183 acres as "Highway Commercial" and "Light Industrial."

**2. California Environmental Quality Act[1] Review**

Kingsburg prepared and circulated a combined initial study and mitigated negative declaration for the annexation project (MND). (See Cal. Code Regs., tit. 14, §§ 15365, 15369.5.)[2] Below, we discuss certain portions of the MND in detail along with the appellate issues to which they pertain.

On September 5, 2012, the Kingsburg City Council certified the MND.

**3. Local Agency Formation Commission Proceedings**

Every county in California has a local agency formation commission. (Gov. Code, § 56325.)[3] These commissions oversee local agency boundary changes, including municipal annexations, under the auspices of the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (hereafter Reorganization Act). (§§ 56000 et seq.; *Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.* (2006) 135 Cal.App.4th 793, 797; see § 56375.)

When Kingsburg certified the MND on September 5, 2012, it also requested that the Fresno County Local Agency Formation Commission (LAFCo[4]) initiate proceedings to approve the annexation. On October 22, 2012, Kingsburg submitted to LAFCo application materials for approval of the annexation.

LAFCo rejected the application since it had relied on a previous application from nine years prior. LAFCo requested Kingsburg submit a new application, and Kingsburg did so in November 2012. The application indicated no change was being proposed to the provision of domestic water for the area.

---

[1]Public Resources Code section 21000 et seq. (CEQA).

[2]The Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) will hereinafter be referred to as the CEQA Guidelines.

[3]All undesignated statutory references are to the Government Code.

[4]"We shall hereafter refer to that commission, and to such commissions generally, as LAFC[o]; the context will make clear which meaning is intended." (*City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 386.)

3.

Kingsburg prepared a service plan, describing how certain services would be provided to the Annexation Territory. (See § 56653.) Kingsburg's service plan is dated July 2012. However, in an e-mail correspondence on November 2, 2012, LAFCo staff informed Kingsburg staff that a service plan was required. Kingsburg staff responded by asking what a service plan was, and they were provided an exemplar by LAFCo on November 8, 2012. This information suggests the service plan was not prepared in July 2012, but rather sometime on or after November 8, 2012.

On November 15, 2012, LAFCo's Executive Officer Jeff Witte sent a notice and request for comment to several local agencies. (See § 56663.) The notice indicated:

> "LAFCo can not [*sic*] take any further action on this resolution of application for 10 days following this notice and request for comments. [¶] If your agency files a written request for a hearing during this 10-day period, LAFCo must notice and hear this proposal at a public hearing. If no written request is filed by your agency, the Commission may proceed without notice and hearing if all required conditions pursuant to state law have been satisfied (Gov Code Sec 56663 (b))[.]"

On November 21, 2012, the City of Selma (Selma) transmitted through counsel a written demand for notice and hearing "[p]ursuant to … § 56663(b)" to Witte. The demand referenced a November 15, 2012, notice from Witte to Selma. Selma's letter demanded LAFCo only make determinations concerning Kingsburg's application after notice and a hearing. The demand also referenced CEQA litigation Selma had initiated against Kingsburg over the annexation project. The demand raised the possibility a court would issue an injunction preventing LAFCo from further processing Kingsburg's application.

On November 28, 2012, LAFCo's counsel provided a written response. The letter indicated Witte believed LAFCo had an obligation to move forward with Kingsburg's application despite the pendency of CEQA litigation. The letter informed Selma that Witte anticipated Kingsburg's application would be considered by LAFCo during its January 9, 2013, meeting, rather than on December 5, 2012.

4.

On December 4, 2012, LAFCo informed Kingsburg in writing its application was incomplete. The letter indicated that in order for a certificate of filing (§ 56658, subds. (f)-(g)) to issue and a hearing to be scheduled, Kingsburg needed to provide a "Signed Legal Indemnity" and a letter from the Selma-Kingsburg-Fowler County Sanitation District indicating its willingness and ability to serve the Annexation Territory.

On December 10, 2012, LAFCo requested additional documentation from Kingsburg.

On March 18, 2013, Witte sent a document to Kingsburg with the heading "CERTIFICATE OF FILING." The body of the document stated:

> "This notice certifies that on March 18, 2013, pursuant to Section 56658(g) …, the proposed 'Guardian/Sun-Maid Reorganization' for the City of Kingsburg was accepted for filing with the Local Agency Formation Commission.

> "The time, date and place for the Local Agency Formation Commission's consideration of the subject proposal is 1:30 p.m., Wednesday, April 10, 2013, in Room 301, Hall of Records, Tulare and 'M' Streets, Fresno."

A notice of public hearing was published in The Business Journal on March 18, 2013. The notice indicated that on April 10, 2013, at 1:30 p.m., LAFCo would be considering Kingsburg's requested annexation.

In a letter dated April 10, 2013, Guardian Industries Corp. requested LAFCo postpone the hearing on the annexation application. The letter indicated that "[w]hile Guardian has not proposed any specific project on the Guardian Property, to remain competitive in the glass manufacturing business, Guardian from time to time is required to perform modifications to its facility, which usually requires discretionary permits from the applicable local agency. Indeed, [a LAFCo] Staff Report recognizes the strong possibility of future expansion …."

That same day, LAFCo continued the hearing on the reorganization "to a date uncertain to allow time for … Kingsburg and the [FCFPD] to negotiate a transition agreement consistent with LAFCo Policy 102-04-041."

A LAFCo executive officer's report, also dated April 10, 2013, indicated that on "March 29, 2013, [Kingsburg] informed LAFCo Executive Officer that [Kingsburg] intends to provide an addendum to the certified Mitigated Negative Declaration addressing the lack of a fire transition agreement between the [FCFPD] and [Kingsburg]."

The addendum to the MND appears in the administrative record. The addendum contains the text "Draft: 040113" at the top, suggesting it was being worked on in early April 2013. The addendum references a transition agreement that had been in place between Kingsburg and FCFPD. The addendum indicated the transition agreement—which concerned the transfer of certain general ad valorem real property tax revenue affected by annexations—had expired and no new agreement was in place. The addendum asserts the absence of a transition agreement "did not result in any new or increased impacts to fire protection services for the Territory after annexation. Additionally, the … Kingsburg Fire Department has sufficient capacity to service [the] Territory with both fire and emergency services."

In a document entitled "LAFCo Notes," Witte commented: "I am concerned that … Kingsburg originally said that there were no projects forthcoming for Guardian Industries or Sun Maid, and I am now hearing from some connections in the construction industry that Sun Maid is looking at a major project."

By June 5, 2013, Kingsburg and the FCFPD were still in negotiations regarding a transition agreement.

On June 24, 2013, LAFCo published in The Business Journal a notice of a public hearing on the annexation for July 17, 2013.

6.

On July 15, 2013, Selma transmitted a letter to LAFCo objecting to the notice of hearing for the July 17, 2013, meeting. Selma asserted that under section 56666, subdivision (a), LAFCo could not continue the hearing to July 17, 2013, because it was more than 70 days after the originally noticed date of April 10, 2013.

LAFCo's counsel responded the 70-day limitation in section 56666, subdivision (a) was directory rather than mandatory pursuant to section 56106.

On the date of the hearing, Kingsburg and FCFPD advised LAFCo they were finalizing a transition agreement. After the public hearing, LAFCo then determined the CEQA documents prepared by Kingsburg were legally adequate, and the annexation was consistent with LAFCo's standards and the Reorganization Act.

LAFCo approved the annexation, subject to several conditions.

On July 24, 2013, LAFCo filed a notice of determination. (Pub. Resources Code, § 21152.)

Selma filed a writ of mandate challenging LAFCo's approval of the annexation. The trial court denied the writ and Selma appeals.

## DISCUSSION

**I.     The 70-Day Time Limit in Section 56666, Subdivision (a) Is Directory, Not Mandatory**

"Issues involving the interpretation and application of statutes are subject to de novo review." (*Cequel III Communications I, LLC v. Local Agency Formation Com. of Nevada County* (2007) 149 Cal.App.4th 310, 317.) Selma presents such an issue by arguing LAFCo violated the Reorganization Act by continuing the public hearing on the annexation for more than 70 days.

Section 56666, subdivision (a) provides: "The hearing shall be held by the commission upon the date and at the time and place specified. The hearing may be continued from time to time but not to exceed 70 days from the date specified in the original notice."

7.

LAFCo does not dispute the hearing was continued to a date more than 70 days after the date specified in the original notice.[5]  Instead, it contends the 70-day limitation is directory rather than mandatory.

> "'A statutory requirement may impose … a duty to act in a particular way, and yet failure to do so may not void the governmental action taken in violation of the duty.  [Citations.]  This distinction is generally expressed in terms of calling the duty 'mandatory' or 'directory.'  '[T]he 'directory' or 'mandatory' designation does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory,' but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.'" (*In re Richard S.* (1991) 54 Cal.3d 857, 865.)

Section 56106[6] provides:  "Any provisions in this division governing the time within which an official or the commission is to act shall in all instances, except for notice requirements and the requirements of subdivision (h) of Section 56658 and subdivision (b) of Section 56895, be deemed directory, rather than mandatory."

The meaning of this statute is clear.  If a provision of the Reorganization Act meets three criteria, it is directory.  First, the provision must "govern[] the time within which an official or the commission is to act …."  (§ 56106.)  Second, the provision must not be a "notice requirement[] …."  (*Ibid.*)  Finally, the provision must not be a "requirement[] of subdivision (h) of Section 56658" or "subdivision (b) of Section 56895."  (*Ibid.*)  If the provision satisfies these three conditions, it is directory and not mandatory.

---

[5]The certificate of filing was issued on March 18, 2013.

A subsequently published notice set the hearing date at April 10, 2013.  Thereafter, LAFCo continued the hearing "to a date uncertain to allow time for … Kingsburg and the [FCFPD] to negotiate a transition agreement …."  Eventually the continued hearing was held on July 17, 2013, more than 70 days after April 10, 2013.

[6]Effective January 1, 2015, section 56106 was amended to reference relettered subdivision (h) of section 56658.  (Stats. 2014, ch. 112, § 3.)  The parties cite to the current version of section 56106 rather than the version in effect in 2013.  We will do the same.

## A. The 70-day Limitation Governs the Time Within Which the Commission Is to Act

Section 56666, subdivision (a) "govern[s] the time within which … the commission is to act." (§ 56106.) Specifically, it requires the commission to "act" by holding a continued hearing within 70 days from the date specified in the original notice. (§ 56666, subd. (a).)

Selma argues the provision does not govern the time within which LAFCo is to act; instead, it "sets outermost limitations for conducting the hearing." Selma argues the subject matter of section 56666, subdivision (a) is the same as section 56658, subdivision (h), and neither statute has anything to do with the time in which LAFCo is to take action. But if that were true, why would section 56106 have to say that it applies to "provisions … governing the time within which an official or the commission is to act … *except for … the requirements of subdivision* (*h*) *of Section 56658*"? (§ 56106, italics added.) If subdivision (h) of section 56658 was not a provision governing the time within which a LAFCo is to act, then there would be no need for this exception. Thus, Selma's interpretation would render language in section 56106 superfluous and we reject it. (See *Card v. Community Redevelopment Agency* (1976) 61 Cal.App.3d 570, 577 [rejecting interpretation of statute because it rendered language in statute superfluous].)

## B. The 70-day Limitation Is Not a "Notice Requirement"

The Reorganization Act does have several notice requirements. For example, section 56660 requires a LAFCo executive officer to give notice of any hearing by publication. Section 56661 requires a LAFCo to make notices available on its Web site if it has one. Section 56155 requires mailed notice to "be sent first class and deposited, postage prepaid, in the United States mails …."

However, section 56666, subdivision (a) is different. In relevant part, it permits continuation of a hearing "not to exceed 70 days from the date specified in the original notice." (§ 56666, subd. (a).) This is a *scheduling* requirement for continued hearings, not a *notice requirement*.

9.

Admittedly, the provision does contain the word "notice."  However, that mention can hardly be described as a notice *requirement*.  The reference to "the original notice" does not articulate any requirement on the notice, but instead is used to describe the *time* requirement being imposed on *the scheduling of continued hearings*.  To illustrate, imagine the statute said "the public hearing cannot be continued for more than 70 days from the date an application is filed with the LAFCo."  No one would call that an "application requirement."  Similarly, section 56666, subdivision (a) is not a notice requirement under section 56106.

C.  **The 70-day Limitation Is Not a Requirement of Section 56658, Subdivision (h) or Section 56895, Subdivision (b)**

The 70-day limitation is not a requirement of either section 56658, subdivision (h) or section 56895, subdivision (b).[7]  Section 56658, subdivision (h) requires the public hearing to be initially scheduled for a date "not more than 90 days after the issuance of the certificate of filing or after the application is deemed to have been accepted, whichever is earlier."

Section 56666, subdivision (a)'s 70-day limitation on continued hearings is nowhere to be found in section 56658, subdivision (h).  Selma emphasizes the last sentence of section 56658, subdivision (h), which reads:  "Notwithstanding Section 56106, the date for conducting the hearing, as determined pursuant to this subdivision, is mandatory."  But that provision concerns the initial scheduling of the hearing, while an entirely different statute—section 56666, subdivision (a)—deals with scheduling continued hearings.  The last sentence of section 56658, subdivision (h) applies, by its own terms, to hearing dates "determined pursuant to this subdivision."  The July 17, 2013, hearing date being challenged here was *not* determined pursuant to that subdivision (i.e., § 56658, subd. (h)).  It was determined pursuant to section 56666, subdivision (a).

---

[7]Section 56895 concerns written requests for a LAFCo to amend or reconsider its resolutions and is clearly inapplicable.  (§ 56895, subd. (a).)

10.

Selma also argues that since the 90-day limitation for initial hearings is mandatory, we should hold the 70-day limitation for continued hearings in section 56666 is also mandatory.[8] There are several flaws with this reasoning.

First, the fact section 56658, subdivision (h) expressly excepts itself from section 56106 while section 56666, subdivision (a) does not, militates *against* finding the latter mandatory. The Legislature clearly knew how to except a provision from the reach of section 56106. The fact section 56666, subdivision (a) contains no such exception indicates the Legislature did not intend to remove it from the scope of section 56106. (Cf. *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 583 [express exception in one statute shows Legislature knew how to enact exception but chose not do so in another statute].)

Second, Selma argues construing the language of section 56666, subdivision (a) as directory rather than mandatory would render section 56658, subdivision (h) meaningless. Selma observes that if the 70-day limit for continued hearings is directory, then a LAFCo could schedule an initial hearing within the 90-day time limit and then continue the hearing indefinitely into the future. But doing so would violate the statute. Even though section 56666, subdivision (a) is directory, it does not permit a LAFCo to act as described in Selma's hypothetical. "'[T]he "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.'" (*In re Richard S.*, *supra*, 54 Cal.3d at p. 865.) In other words, acting contrary to a directory statute is still a "failure to comply" (*ibid*) with the statute. Here, the 70-day limitation on continued hearings is obligatory in

<hr>

[8]In its reply brief, Selma claims it is not contending LAFCo's approval is void because it occurred at a continued hearing set more than 70 days after the original notice of hearing. Selma's primary argument is that no valid continuance occurred and, therefore, the purported July 17, 2013, hearing is governed by section 56658, subdivision (h). But Selma's opening brief also asserts LAFCo's action was void for failing to conform to section 56666, subdivision (a). Even Selma's reply brief goes on to argue that section 56666, subdivision (a) is mandatory.

11.

the sense that a LAFCo violates the Reorganization Act when it continues a hearing in excess of 70 days from the date specified in the original notice.[9] We agree the statutory text indicates the Legislature wanted to avoid the "loophole" Selma describes. But "'[n]o legislation pursues its purposes at all costs.'" (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 48.) While the Legislature requires a LAFCo to hold continued hearings within a particular time frame, it apparently did not want a failure to comply with that time frame requirement to result in invalidation of the LAFCo's determinations. (See § 56106.)

While this conclusion renders the 70-day limit relatively toothless, "'[w]e are not free to rewrite the law simply because a literal interpretation may produce results of arguable utility.'" (*Steven R. v. Superior Court* (2015) 241 Cal.App.4th 812, 821.) We are not concerned with whether a law is toothless, so long as it is intentionally so. (See Code Civ. Proc., § 1858.)

Moreover, even if we agreed it does not make sense to have a *mandatory* 90-day limitation for the initial scheduling of a hearing and a *directory* 70-day limitation on the continuance of hearings, that conclusion would not change our decision. Even when a particular statutory distinction "makes not a whit of sense" (*CSX Transp.*, *Inc. v. Alabama Dept. of Revenue* (2011) 562 U.S. 277, 295), courts must defer to the fact the Legislature "wrote the statute it wrote …." (*Id.* at p. 296.)

### D.     Selma's Contention that No Continuance Occurred Is Unavailing[*]

Selma contends section 56666, subdivision (a) does not apply because the hearing was not continued "to any specific date." We do not see how postponing a hearing is not a continuance merely because the future hearing date is not set at the original

---

[9]In this respect, we disagree with LAFCo's assertion "directory" is synonymous with "discretionary." We do not hold a LAFCo is permitted to continue a hearing beyond 70 days. Instead, we hold that when a LAFCo does continue a hearing beyond 70 days in violation of section 56666, subdivision (a), the consequence is not reversal of its determinations.

[*]See footnote, *ante*, page 1.

postponement.  Selma claims "[a] precise date for the continued hearing must be specified in order for a continuance to be effective."  It cites *In re Angela C.* (2002) 99 Cal.App.4th 389, 392-393 and *City etc. of San Francisco v. Carraro* (1963) 220 Cal.App.2d 509 in support of this assertion.  Neither is on point.  In *Angela C.*, a hearing to terminate parental rights was continued but there was no indication the appellant parent was notified of the actual date of the continued hearing.  (*Angela C.*, *supra*, at pp. 392-393.)  The appellate court held, unremarkably, that a parent must receive notice of the actual date of a continued hearing to terminate parental rights.  (*Ibid.*)  There is nothing in *Angela C.* to suggest it would have been improper for the trial court to have initially continued the termination hearing to a date uncertain and then later set a specific date for the continued hearing so long as the parent was notified of the specified continued hearing date.  And Selma offers no pin cite to the *Carraro* case, which, in any event, concerned the *proof* of notice of a continued trial date and time.  (See *Carraro*, *supra*, at pp. 520-525.)

After briefing was completed, Selma informed us of the case *Gaines v. Fidelity Nat. Title Ins. Co.* (2016) 62 Cal.4th 1081.  (See Cal. Rules of Court, rule 8.254.)  In *Gaines*, the trial court issued an order striking the trial date and purportedly staying the case for 120 days.  (*Gaines*, *supra*, at p. 1089.)  Selma claims the Supreme Court held the trial court's order was in fact a stay, not a continuance.  In actuality, the Supreme Court arrived at the opposite conclusion, holding:  "We conclude that this order striking the trial date at the parties' request should be construed as a continuance of the trial of the action rather than a stay."  (*Id.* at p. 1093.)  Regardless, the issue in *Gaines* was whether a trial court order constituted a *stay* under Code of Civil Procedure section 583.340, subdivision (b).  (*Gaines*, at pp. 1091-1094.)  It is not controlling as to whether LAFCo's actions here amounted to a continuance as contemplated by section 56666, subdivision (a).

Selma observes section 56666, subdivision (a) contemplates hearings being continued "from time to time."  Selma contends this means the hearing must be continued

"from one time to another time." But the hearing here *was* continued from one time to another time. Specifically, it was continued from April 10, 2013, to July 17, 2013. Selma's true complaint is the continuance from one time to another was effected by two separate acts: (1) continuing the hearing to a date uncertain and (2) later setting a continued hearing for July 17, 2013. But the phrase "from time to time" (§ 56666, subd. (a)) does not speak to whether such a continuance must be contained within a single decree.

## II.     Selma Has Failed to Show LAFCo Improperly Relied on the MND[*]

Noting several alleged inadequacies of Kingsburg's CEQA analysis, Selma contends LAFCo improperly relied on the faulty MND.

### A.     Law

#### 1.     Lead and Responsible Agencies Under CEQA

When a CEQA project is to be carried out by multiple public agencies, only one of the agencies is responsible for preparing an EIR or negative declaration. (CEQA Guidelines, § 15050, subd. (a).) This agency is called the "lead agency." (*Ibid*.) All other public agencies with discretionary approval power over the project are called "responsible agencies." (CEQA Guidelines, § 15381.)

When a city prezones and annexes an area, the city is the lead agency and the LAFCo is a responsible agency. (CEQA Guidelines, § 15051, subd. (b)(2).) Here, Kingsburg was the lead agency over the annexation project and LAFCo was a responsible agency.

---

[*]See footnote, *ante*, page 1.

14.

### 2. A Lead Agency's Determination to Prepare a Negative Declaration Is Binding on Responsible Agencies Unless Circumstances Described in CEQA Guidelines Section 15162 Occur

"The determination of the lead agency of whether to prepare an EIR or a negative declaration shall be *final and conclusive* for all persons, *including responsible agencies*, unless:

"(1) The decision is successfully challenged as provided in Section 21167 of the Public Resources Code.

"(2) Circumstances or conditions change as provided in [CEQA Guidelines] Section 15162.

"(3) A responsible agency becomes a lead agency under [CEQA Guidelines] Section 15052."  (CEQA Guidelines, § 15050, subd. (c), italics added.)

Consequently, Kingsburg's decision to prepare a mitigated negative declaration was binding on LAFCo unless one of these three conditions occurred.  There is no question the first and third conditions are inapplicable—Kingsburg's decision to prepare a negative declaration has not been successfully challenged and LAFCo has not become the lead agency on the project.  (See CEQA Guidelines, § 15050, subd. (c)(1), (3).)

Therefore, we must determine whether the circumstances of the project have changed "as provided in [CEQA Guidelines] Section 15162."  (CEQA Guidelines, § 15050, subd. (c)(2).)  If so, the MND would not be final and binding, and LAFCo may have been required to make a different determination.  However, if the circumstances had not changed "as provided in [CEQA Guidelines] Section 15162," then LAFCo cannot be faulted for deferring to Kingsburg's binding determination to prepare a mitigated negative declaration.  (See CEQA Guidelines, § 15050, subd. (c).)

CEQA Guidelines section 15162 provides for additional environmental analysis when any one of three events occur after adoption of a negative declaration or EIR.  (*Id.*, subd. (a)(1)-(3).)  First, additional environmental analysis is required when "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental

effects or a substantial increase in the severity of previously identified significant effects." (*Id.*, subd. (a)(1).) Second, additional environmental analysis is required when "[s]ubstantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (*Id.*, subd. (a)(2).) Finally, additional environmental analysis is required when

> "[n]ew information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following: [¶] (A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (*Id.*, subd. (a)(3).)

For the reasons explained below, we conclude Selma has failed to show the project changed "as provided in [CEQA Guidelines] Section 15162." (CEQA Guidelines, § 15050, subd. (c)(2).) Consequently, Selma has failed to show LAFCo was free to alter Kingsburg's determination a mitigated negative declaration was appropriate. (See CEQA Guidelines, § 15050, subd. (c).)

### B. Water Issues

#### 1. *Background*

With respect to water supply, the MND indicated:

> "Water supplies within the area between the State Route 99 freeway and Golden State Boulevard will be provided by … Kingsburg. A 12-inch water main *has already been extended* in the western shoulder of Golden

16.

State Boulevard from the existing city limits to Amber Avenue capable of serving the entire area between the State Route 99 freeway and the railroad. Each property owner will be responsible for the cost of new service connections, including infrastructure improvements and the completion of a loop (tie-in) with a minimum eight-inch (8") connection between the water main and a development project.

"The industries east of the Union Pacific Railroad *already provide for their own water supplies*. The Vie-Del grape processing plant, Sun-Maid raisin plant and Guardian Industries glass plant *each has two on-site water wells producing adequate supplies of high-quality water*. The small triangular parcel fronting on Mountain View Avenue just east of the railroad tracks is also served by an on-site well. *Eventually [Kingsburg] may provide water service to these properties at the request of the owners*." (Italics added.)

However, Kingsburg's service plan for the Annexation Territory submitted to LAFCo indicated:

"Currently, the three industries that occupy all of the parcels within the subject territory have their own water systems. The Guardian Industries glass plant, Vie-Del grape processing facility and Sun-Maid Growers raisin plant each have two on-site water wells. Through an extra-territorial agreement with George and Lousie [*sic*] Alves, dba G & L Enterprises, 13281 Golden State Boulevard, to extend a water main from Kamm Avenue to Amber Lane [*sic*]. *Once the annexation has been approved* ownership of the water main *will transfer* to [Kingsburg] and be made available for connection to all adjoining properties." (Italics added.)

In its appellate briefing,[10] Kingsburg admits the description of the water main in its service plan was incorrect because Kingsburg already owned the water main and the water main had already been extended to serve the Annexation Territory.

The executive officer's report to LAFCo dated April 10, 2013, repeats information similar to the service plan:

"Currently, the three industries have their own water systems. A water main *will be* extended from Kamm Avenue to Amber Lane. Once the annexation has been approved, ownership of the water main *will transfer* to [Kingsburg] and *be made* available for connection to all adjoining properties." (Italics added.)

---

[10]LAFCo and Kingsburg filed a joint appellate brief.

On July 8, 2013, Kingsburg's contracted city engineer provided city staff with information concerning the water main. He explained the plans for the water line were prepared by Kingsburg in 2008 and the water line had been in operation without water supply issues since 2009. He also indicated the water line was supplied by three of Kingsburg's municipal wells. Finally, he indicated the impacts of pumping groundwater from municipal wells were being addressed pursuant to an agreement between Kingsburg and the Consolidated Irrigation District, which provided for a recharge program.

The executive officer's report dated July 17, 2013, corrected the April 10, 2013, report's description of the water main as follows:

> "Currently, the three industries have their own water systems. A water main *has been* extended from Kamm Avenue to Amber Lane. The waterline is *currently owned and operated* by … Kingsburg and *is* available for connection to all adjoining properties. Water is supplied through … Kingsburg municipal wells. Industry wells do not and will not connect to the waterline. The pumping of groundwater from [Kingsburg] wells and the associated impact to groundwater has been addressed through the existing agreement between … Kingsburg and [the] Consolidated Irrigation District. This agreement provides a groundwater recharge program to offset groundwater pumping by … Kingsburg wells." (Italics added.)

### 2. Analysis

#### (a) Selma Has Not Shown a Substantial Change or Significant New Information Under CEQA Guidelines Section 15162

Selma contends the change in water supply analysis in the July 17, 2013, report shows both a "substantial change" and "significant new information" presented to LAFCo following the approval of the MND. We disagree.

Selma describes the purported change as "the addition of municipal water service." But the possibility of providing municipal water service to the existing industries in the Annexation Territory is not an "addition" to the project made after the MND was adopted. With respect to the existing industries, the original MND noted "[e]ventually [Kingsburg] may provide water service to these properties at the request of the owners." Because the MND acknowledged the possibility existing industries would

18.

connect to municipal water supplies in the future, the potential of municipal water service was not a change of circumstances.

Neither was there any "new information" that would satisfy CEQA Guidelines section 15162, subdivision (a)(3)(A)-(D). The MND stated "[a] 12-inch water main has *already been* extended in the western shoulder of Golden State Boulevard from the existing city limits to Amber Avenue capable of serving the entire area between the State Route 99 freeway and the railroad." (Italics added.) And the MND indicated Kingsburg would provide water to the industries east of the railroad at their request. Therefore, the fact existing industries might eventually be serviced by Kingsburg's water main is not "[n]ew information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time … the negative declaration was adopted …." (CEQA Guidelines, § 15162, subd. (a)(3).)

Selma next claims there is no basis for the conclusion the recharge program contemplated by the agreement between Kingsburg and the Consolidated Irrigation District would in fact offset extractions of groundwater. But even if true, this does not constitute a *change* in circumstances or information since the adoption of the MND.

### (b) Water Code Sections 10910-10915

Selma argues that even if connection to Kingsburg's water supply was indeed contemplated by the MND, Kingsburg was required to prepare a water supply assessment under Water Code sections 10910-10915.

LAFCo first answers this contention by claiming "there was no contemplation of a water connection." This assertion is incorrect; the MND expressly acknowledges the possibility of existing industries connecting to Kingsburg water should they choose to do so.

LAFCo next argues Selma failed "to raise this issue during or before the close of public hearing" and therefore forfeited the issue pursuant to Public Resources Code section 21177, subdivision (a). This response is also incorrect. In a letter to LAFCo's

19.

executive officer dated April 9, 2013, Selma claimed the MND failed to address the water supply despite the requirements of Water Code sections 10910-10915.

Finally, LAFCo submits Water Code sections 10910-10915 do not apply because the annexation is not a "project" under Water Code section 10912, subdivision (a). Water Code section 10912, subdivision (a) defines a "project" for purposes of part 2.10 of division 6 of the Water Code. That definition includes certain residential developments, commercial office buildings, shopping centers, hotels, motels, etc. (Wat. Code, § 10912, subd. (a).) Selma does not dispute the annexation does not fall under Water Code section 10912's definition of a project. Instead, it contends Water Code section 10910, subdivision (b) actually uses CEQA's definition of a "project" rather than the Water Code's definition. Consequently, Selma insists the project is "subject to the water supply assessment requirements of [Water Code] § 10910(b) …."

Selma's contention is foreclosed by case law, which is clear that a water supply assessment is required "[w]hen a proposed development is subject to CEQA, and it is *also* a 'project' within the meaning of Water Code section *10912* …. (Wat. Code, § 10910, subd. (b).)" (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 523, italics added.)

Moreover, "[t]he provisions of a statute should be construed in context and harmonized whenever possible, and rendering some words surplusage is to be avoided." (*Fig Garden Park No. 2 Assn. v. Local Agency Formation Com.* (1984) 162 Cal.App.3d 336, 342.) Water Code section 10910, subdivision (a) provides that "Any city or county that determines that a project, *as defined in [Water Code] Section 10912*, is subject to the California Environmental Quality Act … shall comply with this part." (Wat. Code, § 10910, subd. (a).) If we read subdivision (b) of Water Code section 10910 to also require a water supply assessment for an action that was a project under CEQA but *not* a project under Water Code section 10912, we would be effectively deleting "as defined in Section 10912" from subdivision (a).

20.

Consequently, no water supply assessment was required under the Water Code.

## C. Fire Protection Issues

### 1. Background

According to Kingsburg's July 2012 service plan, the Annexation Territory was then being served by the FCFPD from Station 83, with supplemental protection from several agencies, including Kingsburg's Fire Department. Station 83 is directly across from the Guardian Industries Corp. glass plant on Mountain View Avenue.

With respect to the plan for fire protection services after annexation, the MND stated:

> "The annexed area will be served by [Kingsburg]'s fire department. … Kingsburg has determined that it has sufficient service capability to meet the fire and emergency response needs of the area. A transition agreement is in place between [Kingsburg] and the [FCFPD] that addresses financial impacts resulting from detachment from the [FCFPD]. Impacts on fire protection would be less than significant."

Sometime in 2013, an addendum to the MND was prepared. The addendum indicated the transition agreement between Kingsburg and the FCFPD—which had concerned the transfer of certain general ad valorem real property tax revenue affected by annexations—had expired and a new agreement was not in place. The addendum asserts the absence of a transition agreement "did not result in any new or increased impacts to fire protection services for the Territory after annexation. Additionally, the … Kingsburg Fire Department has sufficient capacity to service [the] Territory with both fire and emergency services."

In a March 28, 2013, letter to LAFCo opposing the annexation, the FCFPD explained it receives funding primarily through taxes levied on all property within the FCFPD's boundaries. The FCFPD claimed that over the last 10 years, city annexations had resulted in a funding loss of $5.5 million in property tax revenue. With respect to this project, detaching the Annexation Territory from the FCFPD would cause the FCFPD to lose $101,302 in annual funding. This would "equate[] to" a loss of two full

21.

time paid firefighter positions at Station 83. This placed the station "at risk of being closed," which would "result in reduced emergency services to the Guardian Glass, Sun Maid Raisin, and Vydell [*sic*] Winery facilities, an overall reduction in services throughout the Fire District, as well as less support to the Cities …."

The March 28, 2013, letter indicated LAFCo's existing policies required cities seeking annexation to have a transition agreement in place before an annexation would be approved. The letter encouraged LAFCo to not change that policy. The letter also indicated the FCFPD had offered "several transition agreement options" to Kingsburg, but they were all refused.[11]

### 2. *Analysis*

Selma argues the expiration of the transition agreement and "the consequent loss of service from Station 83" are circumstances that developed after the application was filed.

Not every event occurring after adoption of a negative declaration requires an EIR. The subsequent event must somehow involve a new *significant* environmental effect, *substantially* increase the severity of previously identified effects, or show a mitigation measure would *substantially* reduce one or more significant effects. (CEQA Guidelines, § 15162, subd. (a)(1)-(3).) Here, there is no evidence the anticipated change in fire protection would meet any of these substantiality requirements.

---

[11]In its statement of facts, Selma claims the chief of Kingsburg's Fire Department testified at a city council hearing that Kingsburg "could not provide fire protection services without Station 83 …." First, the citation Selma offers in support of this assertion is from the record in a separate appeal, *City of Selma v. City of Kingsburg* (F071156, app. pending). Moreover, the cited document does not say what Selma claims it does. And the audio recording of the hearing (also from the record in case No. F071156) indicates Chief Ray did not offer such testimony. Chief Tim Ray stated that "regardless of whose area [i.e., the Annexation Territory] that actually is, I don't believe that our response to that area is going to be any different whether it's Fresno County's or if it's the City of Kingsburg. We both have an engine that's staffed." Chief Ray acknowledged large fires could require additional resources, but that would also be true if the FCFPD were responding. Chief Ray said, "In my opinion, I don't see this annexation changing the fire response in any way."

22.

Kingsburg's position was the annexation would cause no significant impact on fire protection because Kingsburg could provide adequate fire protection to the Annexation Territory on its own. Selma cannot attack that conclusion by insisting there is evidence Kingsburg would not have the help of the FCFPD or Station 83. Indeed, the entire point is that Kingsburg concluded it could service the area adequately on its own. If Selma wanted to successfully challenge that conclusion, it needed to point to substantial evidence supporting a fair argument the level of fire protection Kingsburg would provide on its own may cause significant environmental impacts. It has not done so.

Selma's argument also briefly references "new information concerning Guardian's expansion," but then immediately goes on to describe purported new information concerning the provision of water. It does not explain how any new information concerning Guardian Industries Corp. satisfied the conditions of CEQA Guidelines section 15162, subdivision (a).

## III.    Selma Has Failed to Show LAFCo Prejudicially Abused its Discretion[*]

### A.    Standard of Review

A LAFCO annexation determination is a quasi-legislative act subject to judicial review under the ordinary mandamus provisions of Code of Civil Procedure section 1085. (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 495.) A party may seek to set aside the determination of a LAFCo on the grounds it violated the Reorganization Act. (§ 56107, subd. (c).) In such an action, courts may only inquire as to "whether there was fraud or a prejudicial abuse of discretion. Prejudicial abuse of discretion is established if the court finds that the determination or decision is not supported by substantial evidence in light of the whole record." (*Ibid*.) "[N]o resolution adopted by the commission making determinations upon a proposal shall be invalidated because of any defect, irregularity, or omission in any act, determination, or

---

[*]See footnote, *ante*, page 1.

23.

procedure which does not adversely and substantially affect the rights of any person, city, county, district, the state, or an agency or subdivision of the state." (§ 56107, subd. (a).)

### B. Analysis

#### 1. *Even When a LAFCo's Resolution Approving an Annexation Does Not Articulate Reasons for its Determinations, Reversal of those Determinations Is Not Warranted Unless the Administrative Record Fails to Show the Reason and Basis for the Determinations*

Selma first argues LAFCo's resolution approving the annexation does not articulate any reason for its determinations. However, while it is preferable for a LAFCo to formally enter a statement of reasons in its resolution, it is not "essential." (*McBail & Co. v. Solano County Local Agency Formation Com.* (1998) 62 Cal.App.4th 1223, 1230.) Instead, it is the *administrative record* that must show "the reason and basis for" the LAFCo's decision. (*Ibid.*; see § 56107, subd. (c).)

#### 2. *LAFCo Policy 210-08 Provides for Minimization of Peninsulas in Agency Boundaries; It Does Not Outright Prohibit Them*

Selma argues that, under LAFCo Policy 210-08, boundaries "must" avoid the creation of peninsulas, corridors, and other distortions. That is incorrect. Under LAFCo Policy 210-08, proposed boundaries are to "*minimize* creation of peninsulas and corridors, or other distortion of boundaries …." (Italics added.) LAFCo's executive officer's report determined that in evaluating whether to approve a peninsula, "regional context should be considered that takes in to [*sic*] account the effect of major transportation routes and the city's general plan." The report further observed Fowler, Selma and Kingsburg all have spheres of influence elongated near State Route 99 due to "street visibility for marketing, impact of traffic (noise, activity, odors, dust) on sensitive land uses making it more viable for heavy commercial and industrial uses and access to adjacent railroad." Consequently, the report concluded the "logic of growth along the corridor" had been demonstrated.

### 3. Purported Corridors Along State Route 99 in Selma and Fowler

Selma claims, along State Route 99, "[t]here is no corridor in either Selma or Fowler." It offers no citation to the record in support of this assertion and has thereby forfeited it.

Moreover, the executive officer's report identified several considerations supporting the creation of elongated boundaries along State Route 99 (e.g., street visibility for marketing, traffic impacts, etc.). These considerations retain their force even if other cities, in fact, did not have corridors.

### 4. Irregularity of Annexation Territory's Shape

Selma observes Fresno County had "originally noted" the Annexation Territory was "extremely irregular." But substantial evidence review does not permit reversal merely because "other substantial evidence would have supported a different result." (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208.) In other words, it is irrelevant that LAFCo may have been justified in denying Kingsburg's application on the grounds the proposed boundaries were irregularly shaped. So long as there is substantial evidence supporting what the LAFCo actually determined, it must be upheld. (See § 56107, subds. (b)-(c).) Here, LAFCo reasonably concluded the proposed boundaries were a logical reflection of considerations pertaining to State Route 99. We find no prejudicial abuse of discretion in that determination, even though there was some evidence the boundaries were irregular.

### 5. Purported Kingsburg Resolution

Selma observes LAFCo's executive officer referenced a purported Kingsburg resolution indicating the annexation application "'confined its area requested to that area needed to include the substantial development and create logical boundaries.'" Selma contends no such resolution exists. We find this argument irrelevant on substantial evidence review. LAFCo made its own determination the boundaries were logical. And that determination was supported by substantial evidence, even without the purported Kingsburg resolution described by the executive officer.

### 6. *Adequacy of Plan for Water Service*

Selma contends there was no adequate plan for providing water service in the Annexation Territory. We disagree. The service plan indicated the Guardian Industries Corp. glass plant, Vie-Del Company winery facility, and Sun-Maid Growers of California raisin plant each have two on-site water wells. It also indicates those industries will have the option of connecting to a water line following annexation.

Selma then offers a similar, yet qualified, argument that "[t]here is no solid indication of how services are to be provided *at least not one that is consistent* with the other indications provided by this same source, Kingsburg." (Italics added.) This contention does not survive substantial evidence review. We are only concerned with whether the LAFCo's determination is "supported by substantial evidence in light of the whole record." (§ 56107, subd. (c).) As described above, the service plan and contract city engineer's analysis supply substantial evidence here. Conflicts in the evidence do not warrant reversal on substantial evidence review.

LAFCo asserts the service plan's reference to the *future* transfer of the water main was a mistake. Selma offers a different view: that the service plan's reference to a future transfer was not a mistake and that a water main to service the existing industries had in fact not been extended at that point. But substantial evidence review does not permit reversal merely because there is evidence to support both sides. Indeed, it often precludes reversal in such circumstances. Given the explanations provided by Kingsburg's contracted city engineer, there was substantial evidence supporting LAFCo's implied conclusion the service plan's reference to a future transfer of the water main was a mistake. "While there is some conflict in the evidence on some of the issues before LAFCO, there is substantial evidence to support its conclusions …. This court's power begins and ends with that determination." (*Meyers v. Local Agency Formation Com.* (1973) 34 Cal.App.3d 955, 961.)

Selma contends the contracted city engineer's analysis cannot constitute substantial evidence because it was hearsay. However, Selma offers no authority the

26.

hearsay rule applies to a LAFCo's quasi-legislative determination to approve an annexation. (See Evid. Code, § 300 [Evid. Code applies to actions before the Supreme Court, courts of appeal, or superior courts and proceedings in such actions conducted by other officers].)

### 7.    *Repeal of Design Standards*

At various points in its opening brief, Selma discusses the fact Kingsburg repealed its design standards applicable to the Annexation Territory. However, Selma's opening brief does not offer a developed argument supported by citations to authority as to how the repeal of the design standards satisfies CEQA Guidelines section 15162 or otherwise warrants reversal. Moreover, Selma's discussion of the design standard repeal relies on the record from a separate appeal, *City of Selma v. City of Kingsburg* (F071156, app. pending).

### 8.    *Addendum*

Selma claims the purported addendum issued by Kingsburg concerning the expiration of the transition agreement was not a valid CEQA document. For example, it was not considered with the final MND prior to Kingsburg making a decision on the project. (See CEQA Guidelines, § 15164, subd. (d).) But even if the addendum was not a valid CEQA document, that does not mean the LAFCo was precluded from considering it. To the contrary, we are precluded from disturbing a LAFCo determination so long as there is no fraud and it is supported by substantial evidence in light of the "whole" record. (§ 56107, subd. (c).) The addendum provided information contemplated by LAFCo policy concerning the absence of a transition agreement. The LAFCo was permitted to consider it for that purpose even if it was not a valid CEQA document.

### 9.    *Sphere of Influence*

Selma next submits there is no substantial evidence supporting LAFCo's determination the annexation is consistent with Kingsburg's sphere of influence. It

27.

argues the Kingsburg sphere of influence relied upon by LAFCo is void because it spans across two counties.

A "sphere of influence" is a "plan for the probable physical boundaries and service area of a local agency" as determined by a LAFCo. (§ 56076.) Accordingly, the sphere of influence for Kingsburg should reflect its "probable physical boundaries and service area."

A city may not annex territory in another county. (See *County of San Mateo v. City Council* (1959) 168 Cal.App.2d 220, 221-224.) As a result, a city's "probable physical boundaries" (§ 56076) will never include territory in another county. However, a sphere of influence is not limited to an agency's probable physical boundaries—it also includes the agency's "service area." (§ 56076.) Here, there was evidence in the administrative record that Kingsburg "provides water service" to properties in Tulare County via service agreements with Tulare County and private land owners. A strong argument can be made that while Kingsburg's "probable physical boundaries" could not include portions of Tulare County, its "service area" can. However, we need not decide this issue because Selma has not shown prejudice, even if the sphere of influence was improper.

In order to set aside a LAFCo determination on the basis of a "defect, error, irregularity or omission," prejudice must be shown. (§ 56107, subd. (a).) We do not see how the alleged error asserted by Selma is prejudicial. Regardless of whether it is ever permissible for a sphere of influence to span two counties, the actual annexation approved here involved an area wholly within a single county. Even if LAFCo determined the annexation was compatible with an invalid sphere of influence, it has not been shown the rights of any county, city or person were "adversely and substantially" affected thereby. (§ 56107, subd. (a).)

### 10.    *Selma Crossings Project*

Finally, Selma asserts its own development project called Selma Crossings "requires major rehabilitation of the interchange at 99 and Mountain View." It contends "[i]f the fourth corner of Highway 99 and Mountain View are annexed to Kingsburg, Selma lacks jurisdiction or authority over the fourth corner of the interchange that it needs to rebuild. Accordingly, the development would require Kingsburg's participation which is not forthcoming." Not a single one of these statements is supported by citation to the record, and we will therefore not consider this argument. (See *Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.*, *supra*, 135 Cal.App.4th at p. 814 [court would not consider factual assertions not supported by citations to the record].)

**DISPOSITION**

Affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
DETJEN, J.